Citation Nr: 1706036 
Decision Date: 02/28/17 Archive Date: 03/03/17

DOCKET NO. 08-32 159 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Des Moines, Iowa


THE ISSUE

Entitlement to a total disability rating based upon individual unemployability (TDIU).


REPRESENTATION

Appellant represented by: Robert Chisholm, Esq.


WITNESSES AT HEARING ON APPEAL

The Veteran and his spouse


ATTORNEY FOR THE BOARD

K. Hubers, Associate Counsel

INTRODUCTION

The Veteran had active military service from May 1987 to December 1990.

This matter comes to the Board of Veterans' Appeals (Board) from an October 2009 rating decision issued by the Department of Veterans Affairs (VA) Regional Office (RO) in Des Moines, Iowa. 

During the pendency of this appeal, the Veteran provided sworn testimony in support of his appeal during a hearing before a Decision Review Officer in February 2008 and the undersigned Veterans Law Judge in May 2013. Hearing transcripts have been associated with the file.

To the extent the record contains evidence not yet considered by the AOJ, the Veteran waived AOJ consideration of that evidence. See June 2016 Letter from Veteran's Representative. The Board may proceed to the merits. 38 C.F.R. § 20.1304(c).

In November 2013, this appeal was previously before the Board. The Board denied the Veteran's claim of entitlement to a TDIU. The Veteran appealed to the United States Court of Appeals for Veterans Claims (Court).

In April 2014, prior to a decision on the appeal, the parties agreed to and the Court granted a Joint Motion for Remand (JMR). The 2014 JMR vacated the denial of a TDIU and remanded the claim to the Board for action consistent with the JMR.

In November 2014, the appeal returned to the Board, and the claim for a TDIU was again denied. The Veteran appealed this decision to the Court. Prior to the Court issuing a decision in the matter, the parties agreed to another JMR (2015) to vacate the Board's decision and remand the claim back to the Board for readjudication.

In January 2016, upon return of the matter from the Court, the Board remanded the matter to the AOJ for further development. The matter has returned to the Board after additional development and readjudication by the AOJ. The Board finds substantial compliance with its remand instructions, so it may proceed to the merits of the claim. See Stegall v. West, 11 Vet. App. 268, 271 (1998); see also Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (noting that Stegall requires substantial compliance with remand orders, rather than absolute compliance).


FINDINGS OF FACT

1. Throughout the appeal period, the Veteran had earnings that exceeded the poverty threshold determined by the Census Bureau, and the facts of his situation do not otherwise establish that his employment during this period was marginal in nature.

2. The Veteran's service-connected disabilities were not of such severity that they effectively precluded all forms of substantially gainful employment for which the Veteran's education and occupational experience would otherwise qualify him.


CONCLUSION OF LAW

The criteria for TDIU have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.18 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

I. General Legal Principles

Under 38 U.S.C.A. § 7104, Board decisions must be based on the entire record, with consideration of all the evidence. The law requires only that the Board address its reasons for rejecting evidence favorable to the claimant. Timberlake v. Gober, 14 Vet. App. 122, 128-29 (2000). The Board must review the entire record, but does not have to discuss each piece of evidence. Gonzales v. West, 218 F.3d 1378, 1381 (Fed. Cir. 2000).

In deciding the Veteran's claim, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the Veteran prevailing in either event; or whether a preponderance of the evidence is against the claim, in which case the claim is denied. 38 U.S.C.A. § 5107; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination, the benefit of the doubt is afforded the claimant.

In determining whether statements submitted by a veteran are credible, the Board may consider internal consistency, facial plausibility, and consistency with other evidence submitted on behalf of the claimant. Caluza v. Brown, 7 Vet. App. 498 (1995). Competency of evidence differs from weight and credibility. The former is a legal concept determining whether testimony may be heard and considered by the trier of fact, while the latter is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997); Layno v. Brown, 6 Vet. App. 465, 469 (1994); see also Cartright v. Derwinski, 2 Vet. App. 24, 25 (1991) ("although interest may affect the credibility of testimony, it does not affect competency to testify").

II. Legal Criteria: TDIU

A Veteran may be awarded a TDIU upon a showing that he is unable to secure or follow a substantially gainful occupation due solely to impairment resulting from his service-connected disabilities. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.340, 3.341, 4.16. A total disability rating may be assigned where the schedular rating is less than total when the disabled person is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that, if there is only one such disability, this disability shall be ratable at 60 percent or more, or if there are two or more disabilities, there shall be at least one ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. §§ 3.340, 3.341, 4.16(a).

For the above purpose of one 60 percent disability, or one 40 percent disability in combination, the following will be considered as one disability: (1) disabilities of one or both upper extremities, or of one or both lower extremities, including the bilateral factor, if applicable, (2) disabilities resulting from common etiology or a single accident, (3) disabilities affecting a single body system (orthopedic, digestive, respiratory, cardiovascular-renal, neuropsychiatric), (4) multiple injuries incurred in action, or (5) multiple disabilities incurred as a prisoner of war. 
38 C.F.R. § 4.16 (a).

If a claimant does not meet the threshold criteria, a total disability evaluation may still be assigned, but on a different basis. It is the established policy of VA that all Veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. 38 C.F.R. § 4.16(b). The rating boards are required to submit to the Director, Compensation and Pension Service, for extra-schedular consideration all cases of Veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in 38 C.F.R. § 4.16(a). Id.

The determination of a referral or a grant, if the schedular requirement is met, is dependent on analysis of "whether the veteran's service connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). In determining unemployability for VA purposes, consideration may be given to the Veteran's level of education, special training, and previous work experience, but not to age or any impairment caused by nonservice-connected disabilities. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.19 (2016). The sole fact that a Veteran is unemployed or has difficulty obtaining employment is not enough. The question is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether he or she can find employment. Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993) (citing 38 C.F.R. §§ 4.1 , 4.15, 4.16(a)).

Importantly, disability ratings are based on the average impairment in earning capacity resulting from the disability. 38 U.S.C.A. § 1155; see also 38 C.F.R. § 4.1. For a veteran to prevail on a claim based on unemployability, it is necessary that the record reflect circumstances which place that veteran's case in a different category than other veterans with an equal rating of disability. Van Hoose, 4 Vet. App at 363.

Substantially gainful employment is defined as work that is more than marginal, which permits the individual to earn a "living wage." See Moore v. Derwinski, 1 Vet. App. 356 (1991). Marginal employment is defined as an amount of earned annual income that does not exceed the poverty threshold determined by the Census Bureau. 38 C.F.R. § 4.16 (a). Marginal employment also may be held to exist on a facts-found basis when earned annual income exceeds the poverty threshold. Id. Such situations may include, but are not limited to, employment in a protected environment such as a family business or sheltered workshop. Id. Marginal work is not considered substantially gainful employment.

III. Analysis

Prior to September 16, 2009, the Veteran failed to meet the schedular criteria for a TDIU. He had a combined rating of 60 percent from October 26, 2006 to September 15, 2009. He argues that this meets the rating threshold for schedular TDIU under 38 C.F.R. § 4.16(a). See June 2016 Response to SSOC. However, while the back and neck disabilities are directly related to the in-service fall, the headaches were service-connected as secondary to, and arising after, the back and neck conditions. See March 1990 Rating Decision (finding continued, progressively worse back and neck pain caused atypical migraines). The Board finds that the migraines did not arise from the same incident, but developed subsequently due to the back and neck injuries. These conditions do not, then, have a common etiology. Section 4.16(a) does not provide for combining all three of the Veteran's disabilities under these circumstances.

Since September 16, 2009, the Veteran has met the schedular criteria for a TDIU. The Veteran has multiple service-connected disabilities with a combined rating of 70 percent and with one service-connected disability, atypical migraines, rated at 50 percent.

In any case, the employability criteria for either a grant of schedular TDIU or referral for consideration of whether to grant extraschedular TDIU are the same and are dispositive in this case.

A. Education and Work Experience

The Veteran has his high school equivalency, one year of college, and training in computer programming. 

During military service, the Veteran worked as an executive officer driver. Since discharge, the Veteran has held a variety of positions including as a cabinet assembler and a delivery driver. He was last employed on a full-time basis in August 2002. However, the Veteran continues to work on a part-time basis. 

The Veteran has maintained part-time employment through a family business. He reports being employed as a disc jockey and for his wife's DJ and Karaoke business. He reports working 15 hours per week and earning $50 per week, which helps the Veteran pay for gas when driving to scheduled events. SSA and the 2014 private vocational consultant chose to accept the Veteran's self-report than he is only paid $50 per week, and therefore those reports characterized his employment as not gainful.

However, the Board finds the Veteran's characterization of his "salary" misleading. First, tax records supplied by the Veteran indicate that the business belongs to the Veteran and his wife, jointly. Income tax records filed by the Veteran from 2007 through 2010 list the Veteran as the sole proprietor of the business. Income tax records from 2011 list his wife as the sole proprietor of the business. Income tax records from 2012 and 2013 list the Veteran and his wife as joint proprietors of the business. Income tax records from 2014 and 2015 again list his wife as the sole proprietor of the business.

The February 2009 counseling record indicates the Veteran and his wife own the business. Meanwhile, the Veteran and his wife have maintained before the Board that the business has always belonged solely to his wife. See February 2016 Affidavit of Veteran's Spouse (alleging the business has always belonged solely to the wife "from day one"). The Board finds that the discrepancies in the Veteran's and his wife's reports from one venue to another undercuts their credibility with respect to actual ownership of the business. The Veteran and his wife both have a financial interest in the outcome of this matter, so that also bears weight in evaluating the credibility of their statements to the Board.

The Board finds that the better evidence, particularly income tax records, establish that the business belonged either solely to the Veteran or, alternatively, that the business has belonged to both the Veteran and his wife throughout the appeal period. The more recent statements to the contrary come primarily in the context of this claim for VA benefits and simply cannot be squared with the earlier statements the Veteran and his wife made to the IRS. The Veteran and his wife have maintained that there has not been a change in ownership (such as a sale of the husband's interest in the business to his wife in or around 2014), and the Board finds no persuasive evidence of any transaction transferring ownership of the business from the Veteran (sole proprietor as reflected in 2007 through 2010 IRS records) to his wife. The Veteran cannot represent one form of business ownership to one federal agency (IRS) and then another form of business ownership to VA and expect that VA will simply accept his statements as true. While credibility is often presumed in VA's adjudication of veterans' claims, that is not an absolute given in all cases, and, again, where there is substantial evidence contradicting the assertions a claimant makes to VA when seeking a monetary benefit, then those assertions are no longer credible evidence. That is exactly the situation here.

This determination also finds support in the February 2009 report prepared by a VA vocational rehabilitation counselor which indicates that the Veteran's take home pay is actually $2,400 per month - a figure more consistent with his tax returns. The 2014 JMR states that the 2007 and 2008 tax returns show that the Veteran "appears to have been earning below the poverty level." What the 2014 JMR does not discuss, and what is relevant here, is that although the Veteran's adjusted gross income was apparently below poverty level, that is only because he deducted the majority of his income for business expenses. In 2007 the business's gross receipts were almost $25,000, and the Veteran's car and home expenses, along with other expenses, offset the business's profits. The Board is not suggesting that the Veteran improperly deducted business expenses, but is pointing out that his statement he only makes $50 per week and the 2014 JMR's reference to an income below poverty level does not tell the whole story when factored against the fact that he is the business owner, not his wife, and that the business grossed at least $21,000 and as much as $38,000 in every year from 2007 through 2015.

38 C.F.R. § 4.16 defines marginal income on the basis of earned income (not taxable income after all deductions are taken). Here, the Veteran's earned income, as shown by his tax returns, well exceeds marginal income under the regulations. For example, the Veteran was less than 65 years old in 2007 and the 2007 U.S. Census Bureau poverty threshold for a two-person household under 65 years old was $13,954 - the Veteran's earned income exceeded that by more than $10,000. Similarly, the 2009 U.S. Census Bureau poverty threshold for a two-person household under 65 years old was $14,439 - the Veteran's earned income exceeded that by almost $15,000. So, interestingly, despite SSA finding no substantial gainful activity since 2006, the 2007 and 2009 tax returns clearly show otherwise, according to VA's consideration of earned income.

The Board finds that the Veteran's income exceeded the threshold for "marginal" employment during all relevant times. The Veteran has not argued otherwise, but instead urged that the Board consider the employment as marginal because it was in a protected environment. See June 2016 Response to SSOC. The Board acknowledges that the Veteran's and his wife's statements about their relative contributions to the day-to-day operations of the business weigh in favor of finding the employment is "marginal employment." However, as noted above, their statements regarding the ownership, income from, and operation of the business has not been entirely consistent and both have a financial interest in the outcome of this matter. Therefore, the Board gives their statements regarding the Veteran's minimal contributions to the business very little probative weight compared to the statements made against their interests (e.g. income tax records indicating that the Veteran is the sole proprietor of the business, statements regarding earned income from the business made to the 2009 vocational counselor). The business is a "family owned" business, but the Board finds that the evidence indicates that the Veteran is the owner of the business, rather than that he has been working for a family member in a protected capacity. As discussed above, through his ownership and efforts (as well as those of his wife), he earns income well-above the threshold set for finding "marginal employment" on a presumptive basis.

A finding of marginal employment on a "facts found" basis is not warranted on the evidence before the Board. The evidence indicates that the Veteran is the owner or at least an owner of the business, he actively participates in the operation of the business (though not full-time), and he earns substantial income from the business. This is not a situation where he works for a family member who provides a sheltered employment environment.

Consequently, the Board finds that the Veteran was engaged in substantially gainful employment throughout the period on appeal and, so, does not qualify for TDIU during this period.

However, because the Court indicated in its 2014 JMR that it may be proper to evaluate earnings based on the adjusted gross income reported to the IRS, the Board will also evaluate the issue of employability as a separate, additional ground for its denial of entitlement to TDIU. 

B. Impact of Service-Connected Disabilities on Employability

The Board recognizes that the Veteran has been found disabled by the Social Security Administration (SSA) as of August 2006. Although the Board reviewed SSA's decision, it has no favorable bearing on the claim of TDIU. While SSA examined all severe impairments to determine disability, a claim of TDIU is limited to unemployability based on service-connected disabilities. The Veteran has three such disabilities: atypical migraines, a cervical spine disability and a thoracic spine disability.


SSA's decision discusses, in part, the following:

* Consultative examination in January 2009 showed restricted motion of hips, shoulders, and knees - all nonservice-connected impairment.

* The veteran complained of numbness in the hands and feet, and EMG studies in February 2009 showed early peripheral neuropathy in the hands and feet. This is not a service-connected condition. Service connection was denied in October 2009 and not appealed. As for any implication that these neurological issues are a result of his service-connected neck and thoracic spine disabilities, the medical evidence indicates otherwise. An April 2009 VA neurosurgery note clearly states that EMG demonstrated no evidence of cervical radiculopathy. The September 2009 VA examiner opined the EMG results were consistent with mild or early peripheral neuropathy but not with radiculopathy that would happen from nerve compression from spinal disc disease. The August 2012 VA examiner also found no signs or symptoms of radiculopathy. The Board decision of 2013 found that there was no neurological impairment due to the service-connected conditions, and the Veteran abandoned his appeal of this part of the Board decision, so it is final.

* SSA discussed visual disturbances "linked to the 2007 assault" which created problems with hand-eye coordination - all nonservice-connected impairment.

* SSA discussed numerous psychiatric and cognitive difficulties, such as impaired memory, a mood disorder with irritability, and uneven attention, concentration and pace - all nonservice-connected impairment.

The fact that SSA based its decision on all the Veteran's medical conditions, including nonservice-connected ones, makes its ultimate determination as to inability to work irrelevant to the question presented here. However, the SSA records do provide probative evidence against the Veteran's claim of entitlement to TDIU. Specifically, the SSA's functional capacity assessment specifically found that, but for the August 2006 assault and resulting PTSD with associated cognitive limitations, the Veteran was capable of gainful employment. See April 2007 SSA Functional Capacity Assessment ("Yet the evidence would suggest that he was experiencing no more than moderate limitations and was capable of engaging in routine unskilled competitive employment. The diagnosis of PTSD was first made at the Iowa City VAMC on 1/31/07, but obviously refers back to the traumatic experience of 8/01/06. This would have been just prior to the DLI. Prior to the month of August 2006, the case would have been insufficient."); see also June 2010 SSA Determination and Transmittal (finding disability began in August 2006 and relying on secondary diagnosis of anxiety disorders).

The Board has also discounted the probative weight to be assigned to SSA's ultimate determination and the 2014 private vocational consult's report because both the SSA and the private vocational consultant accepted much of the Veteran's self-reported functional limitations. The vocational consultant recounts a phone conversation with the Veteran where he reports he cannot do any physical activity for more than a few minutes, without then needing to rest, that his neck has "very limited" range of motion, and that he has migraine headaches 7-9 times per week lasting from 30 minutes to several hours. His conclusion that the Veteran could not sustain gainful employment indicates reliance not just on the medical records but on the Veteran's "self-report." See page 4, bottom paragraph. The Board finds that the Veteran's self-reports conflict with objective medical evidence and, moreover, there is significant evidence in the record that the Veteran is not a reliable historian. (For example, the various statements regarding ownership of the karaoke business.)

As for the Veteran's self-reported limitations of range of motion, they are neither competent medical evidence (being given in subjective terms rather than objective measurements and reported by a layman rather than a medical professional) nor credible. As the Board noted in the prior decision, on VA examination in 2008, the examiner noted much voluntary guarding and stated that she could not state that the exam represented the Veteran's full functional capabilities. On VA examination in September 2009, he complained of pain on all ranges and all movements and made jerky movements. The examiner commented on specific inconsistencies in the Veteran's presentation, such as his ability to turn his head to look at the examiner during the interview and crouch down to get his shoes, but then demonstrating more limited range of motion on testing. The examiner concluded the Veteran's demonstrated range of motion on testing was not indicative of his true functional range of motion. The examiner also noted the Veteran's gait was inconsistent, alternating between limping and walking normally. See also February 2009 VA Neuropsychology Consult (noting discontinuance of testing "due to validity concerns" and stating: "The possibility of secondary gain may be entertained."); September 2008 Private Physical Work Performance Evaluation ("The client self-limited on 65% of the 17 tasks...If the self-limiting exceeds 20%, then psychosocial and/or motivational factors [e.g. attempts to manipulate test results] are affecting test results."; also noting a number of observed clinical inconsistences, including inconsistent pain or pain behaviors).

On another VA examination in August 2012, the Veteran stated that he regularly uses a cane for stability and occasionally uses a wheelchair for fatigue. However, the examiner stated: "The Veteran exhibits hyperventilatory behavior and winces with any effort beyond the stationary seated or supine position." The examiner concluded that the limited range of motion findings were "not accurate based on his ambulation to and from the exam room as well as going from standing to the seated position." The examiner concluded the Veteran gave "suboptimal effort" based on specific incongruous actions by the Veteran involving his back movements, including ambulation to and from the room, his ability to sit with his lumbar spine flexed at 90 degrees, and his failure to exhibit any pain when going directly to a sitting position. The examiner also stated that the functional loss shown of less movement than normal, weakened movement, excess fatigability, and pain on movement after repetitive use, were out of proportion to the Veteran's disease process.

It is not only VA examinations that have commented on the Veteran's inconsistent and exaggerated test results - both the Allen Hospital report from 2009 and even SSA evaluations have shown the same. This is discussed more below.

While the SSA and the private vocational consultant chose to accept in entirety the Veteran's self-reported physical limitations, the Board, on a de novo review of the record, finds the Veteran's reports not reliable, based on the repeated inconsistencies on VA examinations between 2008 and 2012. The examiners' conclusions that the findings shown on those examinations were not indicative of the Veteran's true functioning were not unsupported opinions, but, rather, the examiners cited to specific instances during the examinations to support their conclusions.

As will be discussed below, the Board finds the Veteran's service-connected disabilities considered, singly or in combination, do not result in unemployability either before September 16, 2009 on an extraschedular basis or after that date on a schedular basis. 

 a. Atypical Migraines

The Veteran was initially service connected for atypical migraine headaches in a March 1991 rating decision. Since his initial 10 percent rating, the Veteran has received an increase to 30 percent effective in August 2002, which was in effect at the time of his March 2009 claim for a TDIU. 

In a May 2008 compensation and pension (C&P) examination, the Veteran reported having 7 to 8 prostrating headaches a week lasting between 30 minutes to up to four hours on a given day. These headaches are often triggered by light and/or smells. He also reported a "prodrome of lightheadedness, nausea, blurry vision, and irritability immediately to 30 minutes before headache onset" lasting between 30 minutes to two days. These symptoms are also triggered by lights and/or smells. He has also reported migraines triggered while working for the DJ service, when providing testimony at his February 2008 DRO hearing. However, his migraines become so severe that he is unable to see the screen, but he stays because he has to help. The Veteran's migraines have not been so severe that he has ever been hospitalized for them. At most, he reports going to the emergency room for treatment. His symptoms are reduced by lying down in a quiet room. The May 2008 C&P examiner reported that the Veteran had increased absenteeism as a result of his migraines due to pain. 

However, the Veteran received an increased rating for his atypical migraines to 50 percent based on a September 2009 VA examination. The rater discussed symptoms that have been attributed by medical professionals as unrelated to the migraine condition itself, but rather prior head trauma. These distinctions were noted in a September 2009 VA examiner. 

In September 2009, a VA examiner evaluated the Veteran's migraines on employability. The examiner opined that the post-traumatic worsening of the Veteran's migraines is not service connected due to traumatic head injury as well as additional refractory headaches as a result of trying different medications. Specifically, the examiner described "chronic daily headaches" of which roughly half were prostrating. However, he also specifically stated that the headaches worsened "after 2006-2007 head injuries." The examiner also noted the Veteran's report of memory problems since assaults in 2006 and 2007. Examination reports must be read as a whole and, here, the examiner concluded that there was an increase in frequency and severity of the Veteran's headaches that was not service-connected and that it was that nonservice-connected increase which rendered him unemployable. (As the Board reads the report, part of the basis for this opinion was the increased difficulties with memory which were explicitly linked to the post-service physical assaults.)

This opinion and the Board's interpretation of it is consistent with the findings of the SSA examiner who likewise concluded that the Veteran was only unemployable if the (nonservice-connected) effects of the August 2006 assault were taken into consideration. See April 2007 SSA Functional Capacity Assessment.

In February 2011, a VA examiner diagnosed tension headache with migrainous features. She noted the Veteran's report that the headaches lasted from 30 minutes to several hours, but typically two hours. Over the prior 12 months, he had missed two weeks of work due to migraines, neck pain, and/or back pain. The examiner opined that the headaches resulted in increased absenteeism and caused decreased concentration, difficulty following instructions, and pain. The Veteran explained to the examiner his belief that the condition made him forgetful and impacted his concentration. The examiner opined that the Veteran's service-connected disabilities did not prevent him from finding and maintaining gainful employment.

In contrast to the unfavorable opinions of the September 2009 VA examiner, the February 2011 VA examiner, and the April 2007 SSA examiner, the May 2014 vocational expert opinion submitted by the Veteran found him unemployable since 2002 due, in part, to migraines.

The vocational expert stated that having migraines of such a severity would significantly impair one's ability to sustain full-time employment. The Board recognizes that the Veteran is significantly impaired in his occupational functioning and, consequently, may have difficulty obtaining and maintaining regular employment. In fact, a 50 percent rating for headaches recognizes that frequent and prolonged headaches produce or are capable of producing severe economic inadaptability. There is a difference, however, between "severe economic inadaptability" and unemployability for purposes of entitlement to TDIU. If there were no difference, a finding of unemployability would be required where a Veteran met the 50 percent criteria for headaches. This is not the law. See Pierce v. Principi, 18 Vet.App. 440, 446 (2004), as amended (Feb. 8, 2005) (rejecting the contention that "economic inadaptability" equates to unemployability: "nothing in DC 8100 requires that the claimant be completely unable to work in order to qualify for a 50% rating [under DC 8100]").

Also, the vocational expert is not a physician. He merely made an assessment based on the Veteran's subjective statements and the medical record, as he interpreted it, regarding how much the Veteran can work. He did not make a distinction as to what symptoms were attributable to which disabilities, particularly including service-connected versus nonservice-connected disabilities. Only a medical professional is competent to provide medical evidence on that issue and only the adjudicator may resolve ambiguities and discrepancies in the record. 

The Board finds that the increase of the Veteran's symptoms which rendered him unemployable was related to two post-service events rather than his service-connected atypical migraines. As the Veteran reported in a March 2008 VA Medical Center neurological examination report, he was involved in two separate post-service altercations resulting in a traumatic brain injury. In 2007, the Veteran was assaulted and had his head slammed into the side of a truck. In 2008, the Veteran was hit multiple times in the head and knocked out. The 2008 attack was so severe that the Veteran required reconstructive surgery. The worsening of his symptoms began immediately following each attack, as reported by the Veteran and VA medical personnel. He became unemployable due to service-connected and nonservice-connected disabilities after the 2006 assault; however, his service-connected disabilities alone (including the headaches) were not sufficient to render him unemployable. The May 2014 vocational expert's opinion has less probative value than the September 2009 VA examiner's opinion and the April 2007 SSA examiner's opinion.

Also, in November 2010, the Veteran saw a speech pathologist at the Iowa City VA Medical Center (VAMC) to work on cognitive functioning. In his discussions with the speech pathologist, the Veteran noted that his memory issues worsened after a 2007 bar assault, and not as a result of his previously service-connected migraines. See also September 2009 VA Examination (documenting the same reports by the Veteran). This further supports the conclusions of the VA examiner and SSA examiner and, so, the Board's factual finding which resolves the conflicting expert opinions.

The 2014 and 2015 JMRs indicate that the Board should provide additional reasons and bases explaining why the Board finds the Veteran is not unemployable due to his service-connected disabilities despite the RO's decision to assign a 50 percent rating for the Veteran's headaches. The Court has noted that the RO's decision to assign a 50 percent rating for increased symptoms even though the evidence suggested that increase was not due to the service-connected condition was beneficial to the Veteran. The fact that the RO did so, however, does not necessarily lead to a conclusion that the increased symptoms warrant TDIU. See Pierce, 18 Vet.App. at 446. The RO gave the Veteran the benefit of every doubt, particularly where the September 2009 VA examiner did not quantify the frequency or describe the symptomatology due to nonservice-connected causes, in finding that the Veteran's symptomatology met the 50 percent criteria. However, a finding of unemployability would typically require more severe symptoms than those warranting a 50 percent schedular rating. See Pierce, 18 Vet.App. at 446; Van Hoose, 4 Vet. App at 363 ("it is necessary that the record reflect circumstances which place that veteran's case in a different category than other veterans with an equal rating of disability.").

Here, the Veteran's headache symptoms and functional limitations are typical of those of veterans who meet the criteria for a 50 percent rating: "very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability." 38 C.F.R. § 4.124a, DC 8100. The Veteran's headaches typically induce him to seek a quiet, dark place, rather than, for example, lying down and/or sleeping. Though the term "completely prostrating" is not rigorously defined in the regulations, the Board finds the evidence equivocal, at best, regarding whether the Veteran fully meets the 50 percent criteria (rather than more closely approximating it). Migraines generally must be both "very frequent" and "completely prostrating" to warrant a 50 percent rating. The point is that the Veteran's symptoms and functional limitations associated with his atypical migraines are not more severe than other veterans with an equal rating of disability. Instead, the symptoms and functional limitations are of the type and severity that, ordinarily, warrant a 50 percent schedular rating. The circumstances of this case do not place the Veteran's case in a different category from other veterans with similar schedular ratings (either for the migraines alone or for the combined effect of his disabilities).

While the September 2009 VA examination supports finding that there are aspects of the Veteran's migraine symptoms and functional impairments that are due to nonservice-connected causes, the result is no different if the Board considers the full effect of the headaches. There are various other opinions, including that of the February 2011 VA examiner and the April 2007 SSA examiner, that weigh heavily against finding that the Veteran's neck, back, and migraine disabilities combine to render him unemployable. The February 2011 VA examiner opined that, even considering all disabilities, the Veteran was employable. The April 2007 SSA examiner opined that only the psychological and cognitive effects of the August 2006 physical assault (e.g. memory problems, PTSD / anxiety), rendered the Veteran unemployable for SSA purposes.

Even granting the Veteran the benefit of every doubt, the greater weight of the evidence is against finding that the Veteran's migraines render him unable to obtain or maintain substantially gainful employment.

 b. Cervical Strain

The Veteran has recurrent neck pain rated at 20 percent for the entire period. Early diagnostic testing revealed cervical spondylosis and multilevel degenerative joint disease with C6/7 bilateral foraminal stenosis. The Veteran reports incapacitating episodes due to cervical spine lasting two to three days a week five to six hours at a time. However, such limitations have yet to been seen on any examination. 

March 2008 physical therapy notes indicate decreased range of motion in the Veteran's neck by 50 percent in all directions. Limited range of motion in his neck has reduced the Veteran's ability to turn his head while driving. In addition to limited range of motion, the Veteran reports increased additional limitations stemming from this disability.

In a March 2008 Iowa City VA Medical Center medical report, the Veteran reports occasional numbness in his hands and fingers when lifting heavier objects or when driving. However, when evaluated at a May 2008 C&P examination, no neurological deficits were seen and the Veteran had full muscular strength in all extremities, which decreases the likelihood that the Veteran's reported symptoms are a result of his cervical strain disability. Although the cervical paraspinal muscles could not be assessed due to the Veteran's incomplete relaxation, no evidence of compressive neuropathy or cervical radiculopathy was shown. Later examinations conducted in January 2009, May 2009 and June 2009 at the Iowa City VAMC determined that the Veteran's demonstrated early evidence of mild peripheral neuropathy, a nonservice-connected disability unrelated to the Veteran's cervical spine disability. See discussion above.

At the September 2009 VA examination, the examiner opined that the neck disability did not affect the Veteran's employability because the Veteran was previously able to work in laborious jobs such as a cabinet assembler since being service-connected. The examiner could not see how the neck disability had any effect on the Veteran's employability. The examiner also relied on objective tests of the cervical spine, which revealed no signs of pain, spasm, guarding, atrophy, tenderness or weakness in the cervical spine, similar to results seen in previous examinations.

The February 2011 VA examiner reached a similar conclusion regarding employability, though without opining on each service-connected disability. She did identify pain as the primary effect on occupational activities with resulting increased absenteeism.

Aside from conservative treatment, such as taking prescribed medications and the occasional epidural injection such as is seen in June 2010, the medical record, although voluminous, is scant on the issue of how the cervical spine disability created unemployability. Accordingly, VA scheduled the Veteran for another VA examination in August 2012. 

The August 2012 examiner noted significant discrepancies between the Veteran's presentation of symptoms and his objective examination, as seen in several examinations conducted prior to September 16, 2009. For example, when the Veteran was performing range of motion tests in the upper extremities (abduction and extension), the Veteran reported pain in his neck. However, the motions themselves would have not have caused neck pain. This exaggeration indicates that the Veteran is capable of more movement than shown. His abilities are captured within activities of daily living. For example, the Veteran drives, an activity which requires him to turn his neck. The record supports the fact that the Veteran is not unemployable due to his service-connected neck disability. 

Aside from these examinations, the Veteran attended follow-up appointments for treatment including physical therapy, and the use of several at-home conservative measures including taking prescription pain medications such as Vicodin, using a TENS unit, and a Miami J collar with padding to manage his symptoms. 

Despite the reduced range of motion in his neck and residual pain, these symptoms are largely managed with conservative treatment and have not significantly impaired the Veteran's ability to engage in a wide range of activities including general self-care and driving.
 
 c. Degenerative Disc Disease of the Thoracic Spine 

The Veteran is rated at 20 percent for this disability for the entire appeals period. The Veteran contends that he has incapacitating episodes due to the thoracolumbar spine lasting two to three days a week for five to six hours at a time and he is unable to walk more than a few yards.

Throughout the Veteran's treatment record, issues are seen regarding the Veteran's back. For instance in May 2008, the Veteran reported increased back pain after bending over to tie his shoe laces and appeared stiff. He reported pain for nearly a week before it was under control. However, the root of this pain does not appear to be a result of any injury to the thoracic spine. 

Although he has been rated for a disability of the thoracic spine, March 2008 records revealed normal alignment of the thoracic spine without significant disc disease. Despite the Veteran reports of difficulty lifting heavier objects and driving for prolonged periods related to this disability, there is no active disability shown. 

Exaggerations of the Veterans' physical limitations are pronounced in the May 2008 C&P evaluation. The Veteran presented with slow, stiff movements and increased stiffness when initiating movements. Although limitations in range of motion were observed by the examiner, the examiner could not say with certainty whether the examination represented the Veteran's full functional capabilities. The examiner noted the Veteran engaging in voluntary guarding which may have been caused out of fear. However, range of motion improved with repeated repetitions. For example, on the first test, the Veteran had forward flexion at 30 degrees, but had full range of motion shown on subsequent repetitions with 40 and 45 degrees shown on subsequent tests. The Veteran also walked with a normal gait. 

Exaggerations of the Veteran's physical limitations were again observed on a January 2009 psychological examination upon request by the Disability Determination Services. The examiner also noted exaggerations in the Veteran's appearance and gait in relation to his reports of pain. The examiner also noted that the Veteran could walk unaided. 

The Veteran has reported the need to take pain medication for his back disability. He was prescribed a number of narcotic pain medications. He reported nausea when taking Vicodin, but has seen relief with the use of Oxycodone.

The September 2009 VA examiner who provided an opinion on unemployability with respect to the Veteran's other service-connected disabilities, also provided an assessment of employability due to the thoracic spine disability. The examiner found no unemployability caused by the thoracic spine disability because no changes were seen in the spine on diagnostic tests. Objective tests revealed no signs of pain, spasm, guarding, atrophy, tenderness or weakness in thoracic spine.

The February 2011 examiner noted that the back disability resulted in increased absenteeism as well as decreased mobility and pain. Again, the examiner's employability opinion addressed all of the Veteran's service-connected disabilities rather than each separately.

Another examination conducted in August 2012 delved further into the Veteran's asserted limitations. However, the examination results were inconsistent with the Veteran's complaints, as seen in his examination of the cervical spine. The Veteran presented with flexion of 20 degrees, extension at 10 degrees, right lateral flexion at 22 degrees, left lateral flexion at 24 degrees, right lateral rotation at 28 degrees and left lateral rotation at 35 degrees, all below full range of motion. However, the examiner reported the Veteran performed at suboptimal effort on the initial examination as well as in repeated tests, which would align with limitations such as less movement than normal, weakened movement, excess fatigability, pain or movement. The abnormalities seen on the examination are out of proportion to the limitations that would be exhibited with an individual with a mild form of the disease. 

The Board considered these examinations in light of the Veteran's part-time work as a disc jockey, which he continued to do in spite of any reported limitation, and no loss of physical strength which allows him to lift objects up to 40 pounds, the approximate weight of speakers.

Ultimately, the Board does not find the Veteran unemployable due to his thoracic spine. Based on the evidence of record, the Board finds the Veteran has greater physical ability than shown on examinations and as noted by the examiners. Even in considering the Veteran's reported symptoms and comparing those symptoms to his activities of daily living, including his part-time work as a disc jockey, the Veteran would be able to engage in at least sedentary work with a sit/stand option. This would allow the Veteran to reduce any pain caused with prolonged standing, but also allow the Veteran to move around to minimize reported and observed stiffness.

 d. Combined effect of service-connected disabilities

Even considering the combined effects of the Veteran's service-connected disabilities, he would still be employable. Although he exhibits significant limited range of motion in cervical and thoracic spines, such limitations have been noted to be exaggerated on examinations and are not serious impediments to the Veteran's employment as a disc jockey. Additionally, the Veteran's atypical migraines have not rendered him unemployable, as discussed above, though his current nonservice- connected head trauma which caused anxiety and/or PTSD as well as cognitive problems (e.g. attention and memory) likely does.

The Veteran has undergone a number of evaluations of his total physical ability based upon his physical impairments. The first examination took place in May 2008. The examiner considered the combined effects of the Veteran's cervical and thoracic spine disabilities and opined that the Veteran would have increased absenteeism, decreased mobility, problems with lifting and carrying, and chronic pain. The Board finds this assessment is not entirely accurate in light of the examiner's other statements within his examination report of the Veteran's exaggerations during the exam. The Veteran likely has a higher physical ability than observed. The examiner did not consider the impact of the Veteran's migraines on employability, just the spine disabilities. Accordingly, this examination is of limited probative value, particularly with respect to the combined effects of all three of the Veteran's disabilities. The Board has also considered a physical work performance evaluation conducted at the Allen Hospital Iowa Health System in September 2008.

The September 2008 examination evaluated the Veteran's employability based on service-connected and nonservice-connected disabilities affecting the Veteran's neck, back, and head. As seen in the May 2008 C&P examination, the September 2008 physical work performance evaluator also found that the Veteran engaged in significant self-limiting and inconsistent behavior, including assertions of pain, throughout the examination. The Veteran self-limited on 65% of the 17 tasks of the test, meaning he stopped the task before a maximum amount of effort was reached. The examiner noted possible causes for such behavior could be pain, psychosocial issues such as fear of reinjury, anxiety or depression, and /or attempts to manipulate the test. However, it was the examiner's experience that motivated clients self-limited no more than 20 percent. If self-limiting exceeds 20 percent as is seen in this instant case, then psychosocial and motivational factors are affecting the test results. The Veteran also appeared unwilling to continue with testing to completion. As a result, the examiner could only derive the Veteran's minimum exertional ability, which he determined was at the sedentary range. An individual is able to engage in sedentary work if he is "capable of exerting up to 10 pounds of force occasionally (1/3rd of the time) and negligibly lift, carry, push, and pull or otherwise move objects, including the human body." The Veteran would be able to complete an 8-hour day with the option to alternate between siting and standing. Even with the Veteran's self- limiting behavior, the examiner found the Veteran capable of sedentary work with a sit/stand option. Similar results were seen on evaluations performed by the Disability Determination Services in January 2009 and March 2009 who opined that the Veteran could perform a full range of light jobs that resemble his past work, and simple and unskilled tasks. 

Another examination conducted by a Social Security Administration consultative examiner in January 2009 also noted the Veteran's exaggerations on his examination. The Veteran walked unaided but with a slow gait, and had an exaggerated pain response. Even though the Veteran reported being unable to walk more than 200 feet due to pain, and shortness of breath, the examiner indicated that the Veteran had a higher exertional ability. The examiner opined that the Veteran could sit for two hours before needing to change positions to either stand or otherwise move and could lift 40 pounds which is the weight of the speakers he has to move. The Veteran reports dropping them more frequently than usual, but there was no objective limitation seen related to reduced strength or increased severity of the Veteran's back disability consistent with such reported limitations. 

The 2014 JMR stated that the Board must discuss a February 2012 negative finding by VA's vocational rehabilitation services in its assessment of the TDIU claim. There is no February 2012 vocational rehabilitation assessment of record. The Board assumes this must be a typographical error, and was meant to reference a February 2009 assessment. This is so because the 2014 JMR included a citation to the record on appeal, implying the purported 2012 assessment was already of record, and the attorney stated in August 2014 that there was no more duty to assist to fulfill in this case, implying all relevant evidence was already of record. Therefore, the Board will proceed with its analysis based on the February 2009 vocational assessment.

In February 2009, a VA vocational rehabilitation counselor found the combination of the Veteran's back, neck and history of a traumatic head injury substantially contributed to his inability to obtain employment. This is not entirely probative to the question at issue in this case. First, the counselor did not in fact say the Veteran was unemployable, but noted the impact the Veteran's disabilities had on obtaining employment. Unemployment and/or difficulty in obtaining employment is not sufficient to warrant TDIU, rather the pertinent question revolves around the Veteran's physical and mental capabilities. Based on the bulk of the examinations, it appears the Veteran has the minimum capacity to perform sedentary work based on a combination of his service-connected disabilities on a full-time basis. The vocational rehabilitation assessment was that the conditions substantially contribute to his inability to obtain employment, a fact already recognized by disability ratings in effect. Furthermore, the rationale for the conclusion included discussion of the Veteran's memory and concentration difficulties which are not service-connected and have been attributed, by numerous medical professionals, to nonservice-connected conditions (e.g. traumatic brain injury, acquired psychiatric disorders).

The 2014 JMR stated that the Board must discuss the type of gainful employment the Veteran could obtain considering his work history, limited education, and physical limitations. The Board does not interpret the 2014 JMR as suggesting that the Board has to list specific jobs that the Veteran could obtain as that is not generally required (and the 2015 JMR makes no reference to the adequacy of the Board's discussion in its 2014 decision). Rather, as noted, with the Veteran's work history and physical limitations, he could perform a full range of sedentary to light jobs that resemble his past work, with simple and unskilled tasks, with the option to alternate between siting and standing. For example, SSA identified his past experience as a delivery driver as a light to medium physical demand position - obviously the Veteran would have to limit the items he delivered/lifted to a lighter weight, but such a position would involve alternating between sitting and standing. He also has past experience as a salesperson, which although he could not perform in a position requiring that he stand for long periods of time (as in a store), SSA identified acquired skills such as customer service, and there are many customer service or sales positions in more of an office environment, where, again, the Veteran could alternate between sitting and standing.

C. Conclusion

In conclusion, the greater weight of the evidence is against finding that the Veteran's service-connected disabilities have rendered him unemployable. Thus, the Board finds no basis upon which to refer the claim to the Director, Compensation and Pension Service for an extraschedular rating during the portions of the appeal period when the Veteran did not meet the percentage requirements for schedular TDIU. Similarly, the criteria for schedular TDIU have not been met during any portion of the appeal period. As the preponderance of the evidence is against the claim, the benefit of the doubt rule is not applicable. See 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 49, 54-56 (1990). His claim (on both a schedular and extraschedular basis) is denied.

III. VA's Duties to Notify and Assist

VA has met all statutory and regulatory notice and duty to assist provisions in this case with respect to the issue herein decided. See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326.

The information contained in an October 2009 letter satisfied the duty to notify provisions. See 38 U.S.C.A. § 5103 (a); 38 C.F.R. § 3.159 (b)(1); Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002). Neither the Veteran nor his representative have argued that there is prejudicial error with regard to timing or content of notice provided. Shinseki v. Sanders, 556 U.S. 396, 409-13 (2009). The Board discussed compliance with the duties of 38 C.F.R. § 3.103(c)(2) and the holding in Bryant v. Shinseki, 23 Vet. App. 488 (2010), in the 2013 decision. There has been no suggestion during the appeals to the Court that this discussion was in any way inadequate, nor has the Veteran or his attorney raised any allegations that these duties were not satisfied during the hearings in this case.

The VA met its duty to assist the Veteran by obtaining all available relevant evidence to the Veteran's claim. To that end, the VA obtained the Veteran's post-service treatment records from private and VA sources. During the course of appeals to the Court over the past few years, the Veteran has received numerous additional notice letters giving him the opportunity to submit evidence, or, in the alternative, identify evidence he wanted VA to obtain. 

The Veteran was also provided with several VA examinations, the reports of which have been associated with the claims file, which the Board finds to be adequate for rating purposes. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The examiners that performed the examinations were medical professionals and provided the Board sufficient information to render a decision regarding the Veteran's claim for a TDIU. 

In adjudging the adequacy of the examinations, the Board has taken into account the Veteran's statements regarding these examinations. The Veteran indicated displeasure with the September 2009 C&P examination. He felt that the doctor acted inappropriately when she suggested that he see a psychiatrist. The examiner, as a medical professional, may suggest treatment options to an examinee. The Veteran can choose whether or not he wants to accept the recommendations. However, he has not challenged the actual content of the examination report or the examiner's findings. Displeasure with the manner of examination is not sufficient to warrant finding an examination inadequate. Accordingly, the Board finds the September 2009 examiner's evaluation adequate for rating purposes.

In his most recent filings, the Veteran and his representatives have not questioned the adequacy of any other examinations or opinions provided and have not requested any additional examinations or opinions pertinent to the issue of entitlement to TDIU.

Neither the Veteran nor his representative have identified any other relevant evidence that would need to be obtained, the Board finds that no further development is required. Appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993).


ORDER

Entitlement to a TDIU is denied.



____________________________________________
MICHELLE L. KANE
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs